### THE PRESIDENT LINCOLN.

### In re DE MAYO COALING CO.

#### (Circuit Court of Appeals, Second Circuit. May 13, 1912.)

#### No. 217.

SHIPPING (§ 86*)—INJURY TO COALING BARGE—NEGLIGENCE.

    Libelant had a contract for supplying coal to claimants' steamships, which was done from barges alongside, unloaded by a second company, respondent, employed by claimant, by means of electric elevators, having an iron case, and about 35 feet long. If the foot of an elevator had reached the bottom of a barge when the work ceased at night, it was left standing upright, where it was held by guy ropes. One night when so left one of the elevators fell, sinking the barge. There was no direct evidence as to how the accident occurred, but the elevator was fastened in the usual manner which had been followed for five or six years with safety. *Held*, that respondents could only be held liable for the loss of the barge on the ground of negligence, and that the evidence did not show such negligence on the part of either.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 343, 353–360; Dec. Dig. § 86.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Berwind-White Coal Company, as owner of coal barge Eureka, No. 95, against the steamship President Lincoln, the Hamburg-American Line, claimant, and the De Mayo Coaling Company. Decree for respondents, and libelant appeals. Affirmed.

    This cause comes upon appeal from a decree of the District Court, Southern District of New York, dismissing a libel. The suit was brought by the owner of the coal barge Eureka, No. 95, against the steamship to recover for injuries sustained while moored alongside of her at her pier in Hoboken. The barge was there because her owner the coal company had made a contract with the Hamburg-American Line to deliver all bunker coal required by said line for its steamers, deliveries to be made alongside steamer. The steamship company also had a contract with the De Mayo Company to take entire charge of coaling the steamers, that is, transferring the coal from the barge in which it was delivered to the steamers' bunkers. The De Mayo

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Company had certain electric elevators which it used for that purpose, the steamship company furnishing electrical power to operate the motors thereof and all necessary winch power to rig up and take down the machines.

Burlingham, Montgomery & Beecher (Charles C. Burlingham and Roderick Terry, Jr., of counsel), for appellant.

Harold G. Cortis, for appellee The President Lincoln.

Convers & Kirlin (J. Parker Kirlin and Russell T. Mount, of counsel), for appellee De Mayo Co.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). The elevator machine consisted of an endless chain of coal buckets inclosed in an iron case, 34 or 36 feet long, with an electric motor at the top. The method of using it was as follows: The barge being made fast alongside, the elevator was hoisted up to the end of a boom projecting over the ship's side. The hoisting was done by a tackle operated from a hoister boat belonging to the steamship company and also alongside. The elevator was then lowered till its bottom rested on top of the coal, and it was then put in operation; coal being shoveled into the buckets as they revolved. In this way the bottom of the elevator gradually moved downwards through the coal, the tackle allowing it to descend, until it reached the bottom of the hold when boards were placed beneath its legs so that they might not injure the bottom planking of the boat.

Whenever work was stopped at the close of the day, any elevator which was still resting on the coal, an unstable foundation, was hoisted up to the end of the boom and allowed to hang there overnight. If any elevator had, at such time, reached the bottom of the hold and was resting on the boards placed to receive it, the tackle leading to the boom was detached or left free to run on the drum and the elevator was held upright in place by eight guy ropes, running from the top of each machine to the rail of the barge. These automatic elevators of the De Mayo Company have been in use in this port for five or six years; during that time they have always been operated and maintained overnight in the way above indicated without mishap, except that at first there were some complaints of injury done to the bottoms of barges, which was the reason why boards were placed under the legs of the machine, after which there were no further complaints.

Libelant's barge was made fast in the usual way and unloading by two elevators began about 4 p. m. By 6 p. m., when the work was stopped for the day, about 40 tons of coal had been removed. The man in charge of the barge left some time after work began to attend to some business on shore, and came back at about 8:30 p. m. after the accident had happened. Although there is some slight conflict on that point, the proof clearly shows that by the time work stopped both elevators had reached the bottom and rested on boards, and both were secured in the usual way by means of the guy ropes. Since the man in charge of No. 95 was not on board or on the

dock at the time, the narrative of what happened thereafter is very vague and uncertain. The barge Rosie lay ahead of No. 95, and the man in charge of her felt a swell and ran out of his cabin on deck. He naturally gave his attention particularly to his own boat, which also had two elevators standing up in her secured by guys in the usual manner. Afterwards, looking at No. 95, he "saw the lines flying from the guy ropes where they had the elevator made fast, flying around, and the machine and everything was under water, and I heard the rattling of the wire ropes from the boom go. *  *  * The forward machine fell against the ship. Then the boat turned over the other way, and went down."

We can find nothing in the contracts to warrant a finding that either the steamship company or the De Mayo Company was a bailee of the barge. Recovery can only be had upon the libelant showing by a preponderance of proof that there was some negligence on the part of the ship or the loading company. We concur with the district judge in the conclusion that libelant has not sustained the burden of proof necessary to recovery.

The preponderance of evidence shows that the ropes used were proper, good and satisfactory. So far as appears, they were fastened in the usual way, and the elevators were secured as they had been for years without any accident happening, and without any one making any objection to this method of storing them overnight or any suggestion that there was anything unsafe about it.

Judge Holt concludes his oral opinion with these words:

"On the whole I do not see any sufficient ground of fault on the part of the respondents to authorize a recovery against either of them. It is hard on the libelant and it seems a strange thing for this accident to have occurred, but any man who brings a lawsuit has got to prove the right to recover affirmatively, and I do not think that has been done in this case."

In this conclusion we concur.

Decree affirmed, with costs of this appeal, one-half to each respondent.